UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION


| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | File No. 4:12-mj-152 |
| | ) | |
| Jeffrey Jim Butler, aka "Pops," | ) | |
| Nicholas James Gordon Woodford, | ) | |
| Zachary Russell Mills, Tyler | ) | |
| Michael White, and James Dean | ) | |
| Odeneal, | ) | |
| | ) | |
| Defendants. | ) | |


TRANSCRIPT OF PROBABLE CAUSE
AND DETENTION HEARING




Taken at
United States Courthouse
Bismarck, North Dakota
September 10 and 11, 2012




BEFORE THE HONORABLE CHARLES S. MILLER, JR.
-- UNITED STATES DISTRICT COURT MAGISTRATE JUDGE --

APPEARANCES

MR. RICK LEE VOLK and
MR. DAVID HAGLER
U.S. Attorney's Office
220 E. Rosser Avenue
P. O. Box 699
Bismarck, North Dakota 58502-0699

FOR THE UNITED STATES OF AMERICA

- - - - - - - - - -

MR. ROSS H. ESPESETH
Attorney at Law
418 E. Broadway Ave., #240
P. O. Box 995
Bismarck, North Dakota 58502-0995

FOR THE DEFENDANT
NICHOLAS JAMES GORDON WOODFORD

- - - - - - - - - -

MR. THOMAS JOHN GLASS
Attorney at Law
418 East Rosser Ave., Suite 301
Bismarck, North Dakota 58501

FOR THE DEFENDANT
TYLER MICHAEL WHITE

- - - - - - - - - -

MR. THOMAS M. TUNTLAND
Attorney at Law
210 Collins Avenue
P. O. Box 1315
Mandan, North Dakota 58554

FOR THE DEFENDANT
JAMES DEAN ODENEAL

- - - - - - - - - -

<u>GOVERNMENT WITNESS</u>

<u>Page No.</u>

<u>Special Agent Terrance Frank</u>

Direct Examination by Mr. Volk                    7
Cross-Examination by Mr. Glass                   33
Cross-Examination by Mr. Tuntland                35
Cross-Examination by Mr. Espeseth               49
Examination by The Court                         52
Redirect Examination by Mr. Volk                 55

- - - - - - - - -

Certificate of Court Reporter                    75

- - - - - - - - - - -

1          (The above-entitled matter came before the Court, The

2    Honorable Charles S. Miller, Jr., United States District Court

3    Magistrate Judge, presiding, commencing at 2:07 p.m., Monday,

4    September 10, 2012, in the United States Courthouse, Bismarck,

5    North Dakota; with counsel appearing on behalf of the

6    respective defendants as hereinbefore indicated.  The following

7    proceedings were had and made of record in open court with

8    Defendant Woodford, Defendant White, and Defendant Odeneal

9    present:)

02:07    10          - - - - - - - - - - -

11          THE COURT:  We'll go on the record in Magistrate's

12   Number 4-12-152, United States of America versus a number of

13   defendants, including James Dean Odeneal, Tyler Michael White,

14   and Nicholas James Gordon Woodford.  Present in court are the

02:08    15   defendants.  Appearing on behalf of Mr. Odeneal is

16   Mr. Tuntland, who the Court is appointing or has appointed as

17   counsel; Mr. Glass on behalf of Mr. White; and Mr. Espeseth on

18   behalf of Mr. Woodford.  All of you gentlemen have requested

19   court-appointed counsel.  Is that correct, Mr. Woodford?

02:08    20          MR. WOODFORD:  Yes.

21          THE COURT:  Okay.  And, Mr. White, same with you?

22          MR. WHITE:  (Nodding.)

23          THE COURT:  And, Mr. Odeneal, same with you?

24          MR. ODENEAL:  Yes, sir.

02:09    25          THE COURT:  Present in court is Mr. Volk on behalf of

4

1    the United States and Mr. Hagler.  Mr. Odeneal, I -- when you

2    appeared, I guess you had some concerns about proceeding by

3    videoconference, but have you received a copy of the Complaint?

4         MR. TUNTLAND:  You've received this.  I provided him

02:09   5    with a copy, Your Honor, and I believe he had one when I spoke

6    to him up in Rugby on Friday.

7         THE COURT:  Okay.  Mr. Odeneal, as the Magistrate

8    Judge explained to you by video, you do have the right to

9    remain silent.  Anything that you say can be used against you.

02:09   10   If you have said anything to anyone prior to appearing in

11   court, that does not mean you have to say anything further.  If

12   you start to say, anything you can stop at any time.  You don't

13   have to say anything without first having consulted with an

14   attorney.

02:09   15        You do have the right to be represented by an

16   attorney, and, in fact, I've appointed one for you.  In

17   addition, you have the right to have an attorney present with

18   you if anyone should attempt to question you in the future.

19   Those are the things that I think Judge Klein went over with

02:10   20   you when she saw you by video, but you had concerns about

21   appearing by video.

22        THE DEFENDANT:  Yes, sir.

23        THE COURT:  In addition, each of you has the right to

24   have a hearing on the issue of release or detention and also a

02:10   25   preliminary hearing for me to determine whether there's

5

1  probable cause to believe that you have committed the crime as

2  charged in the Complaint, and that's the subject of today's

3  proceedings, I believe.  Is that correct, Mr. Volk?

4           MR. VOLK:  Yes, Your Honor.

5           THE COURT:  The United States then may proceed.  And

6  I guess my intention here would be to make a combined record

7  that would apply to both the detention hearing and the

8  preliminary hearing, so we don't have to listen to some of the

9  same evidence twice.  In addition, the Court will make a part

10  of the record the Pretrial Services Report that's been prepared

11  for each of the individuals, and the attorneys can proffer any

12  additions or corrections as we proceed.  With that background

13  then, Mr. Volk, you may proceed.

14           MR. VOLK:  The United States calls Terrance Frank,

15  Your Honor.

16                SPECIAL AGENT TERRANCE FRANK,

17  having been first duly sworn, was examined and testified as

18  follows:

19           THE COURT:  And, Mr. Glass, you still have a 3:30

20  appearance in state court?

21           MR. GLASS:  I do, Your Honor.

22           THE COURT:  Okay.  If we get toward the end here and

23  we haven't quite finished, we may have to continue with you

24  tomorrow, but -- you and your client, but we'll -- hopefully

25  we'll get through it.  Very good.

6

<u>DIRECT EXAMINATION</u>

<u>BY MR. VOLK</u>:

**Q.**   Agent Frank, could you tell the Court your name and occupation, please?

**A.**   My name is Terrance Frank.  I'm a special agent with the FBI.

**Q.**   You work out of the Minot office, is that correct?

**A.**   That's correct.

**Q.**   And, Agent Frank, you have been involved in the investigation of injuries that occurred to an individual by the name of Robert Osterhout?

**A.**   That is correct.

**Q.**   You've been working in conjunction with the Williston, North Dakota, police department in that investigation, is that correct?

**A.**   That's correct.

**Q.**   Could you explain to the Court how authorities became involved with Mr. Osterhout?

**A.**   On August 13th, at approximately 5:43 a.m., 911 out in Culbertson, Montana, received a -- received a phone call from a resident out in the area that they had a bloodied, beaten-up guy that came up to his house and so contacted law enforcement. From there law enforcement came out.  They took what type of statement -- what kind of statement they could, because he was in pretty bad condition, from him at the time and found out

7

1  that he was last in Williston, and then he was transported to

2  the hospital in Culbertson.

3  **Q.**   He was eventually transported to Trinity Hospital in

4  Minot --

02:13  5  **A.**   That is correct.

6  **Q.**   -- is that correct?  And you've had contact with Mr.

7  Osterhout at Trinity Hospital in Minot?

8  **A.**   That's correct.

9  **Q.**   Could you describe his physical condition as he appeared

02:13  10  when you met with him?

11  **A.**   Yes.  He was -- he was pretty banged up.  It was his --

12  his right eye was completely swollen shut still.  He had a

13  really bad ligature mark around his neck, as well as bruising

14  all over his jaw, his neckline.  He had cuts on his face.  He

02:13  15  proceeded to tell me that he had a few broken ribs, like four

16  or five.  I had him lift his shirt.  He showed me the area

17  where the injury was, and it was completely black and purple.

18  And he also told me about a fractured collarbone, as well as

19  injury to his back, and he showed me that as well, and that was

02:14  20  pretty much black and blue as well.

21  **Q.**   All right.  Did you ask Mr. Osterhout to describe to you

22  what he recalled that led to him receiving those injuries?

23  **A.**   Yes, I did.

24  **Q.**   What did he describe to you had occurred?

02:14  25  **A.**   He told me that he was taken to a campsite where the

1   individuals were in Williston, were staying at because he had

2   no place to stay.  He had recently lost his job in Sidney,

3   Montana, so he had no place to stay.  An individual by the name

4   of Jeffrey Butler said he could stay with him at his camper,

5   his campsite that he had, so he went there.  While he was there

6   he was just talking with some friends, and Nick Woodford told

7   him to come over to another camper, where him and Zac and Tyler

8   were.  While he was over there talking, they were asking him

9   questions, you know, asking him basically why he snitched.  And

10   before he could even say anything is when he was hit by someone

11   with brass knuckles, he identified as Zac Mills.  And then he

12   said from there he was just beaten by Nick and Zac.

13   **Q.**   He was beaten by Nick and Zac, Nick being who?

14   **A.**   Nicholas Woodford.

15   **Q.**   And Zac is who?

16   **A.**   Zachary Mills.

17   **Q.**   Did he indicate that he was struck or injured in any other

18   ways?

19   **A.**   Yes.  He said that he was hit with brass knuckles.  He

20   said he was also tased multiple times with tasers, and that Zac

21   actually used a razor blade to cut his face.

22   **Q.**   Did Mr. Osterhout indicate that Jeff Butler was present at

23   any point in time?

24   **A.**   Yes.  He said the beating went on for -- he doesn't -- he

25   doesn't recall how long it went on for.  He said some time

1   elapsed, and eventually Jeff Butler came into the camper where

2   he was and told everybody in there to clean him up and get rid

3   of him.

4   **Q.**   Did he indicate what happened after that?

02:16   5   **A.**   He said that he was basically -- he was wrapped up.  His

6   hands and his feet were bound.  Duct tape was placed over his

7   mouth, and he was wrapped up in a plastic sheet and placed in a

8   trunk of a vehicle.

9   **Q.**   Did he know who had bound his hands and feet?

02:17   10   **A.**   He just said that Nick and Zac tied him up.

11   **Q.**   Did he indicate what happened after he was thrown into the

12   vehicle?

13   **A.**   He said that he tried to struggle to get free, and then

14   that's the last thing he remembered.

02:17   15   **Q.**   What did he remember?

16   **A.**   Being in the trunk of the vehicle when the car was moving,

17   and he tried to struggle to get out, but then he just remembers

18   waking up in the hospital after that.

19   **Q.**   As the investigation continued, was there information

02:17   20   gathered from Zac Mills?

21   **A.**   That is correct.  A few days after the incident he was --

22   he traveled to Montana and spoke with Yellowstone County

23   sheriffs out there and gave a statement basically saying that

24   he was involved in a beating of someone and that they thought

02:18   25   he was dead and that he was in fear of his life now because he

1   knows exactly what happened, you know, to this guy.  He was

2   involved in it, and he was afraid that the other individuals

3   involved were going to come after him and get him, so he gave a

4   statement to them and as well as FBI out there, and then he

02:18   5   moved on, out to Oregon.

6         THE COURT:  And this was which individual again?

7         THE WITNESS:  This was Zachary Mills.

8         THE COURT:  Okay.

9   Q.   (MR. VOLK CONTINUING)  Mr. Mills provided some information

02:19   10   about others who were involved in this incident?

11   A.   That's correct.  He said that Nick Woodford was involved,

12   Jeffrey Butler was involved, Tyler White was involved, and

13   James Odeneal.

14   Q.   And that information was transmitted to the Williston

02:19   15   Police Department, is that correct?

16   A.   That's correct.

17   Q.   And subsequently did the Williston Police Department have

18   occasion to make an arrest of Tyler White?

19   A.   That's correct.

02:19   20   Q.   Where did they arrest him at?

21   A.   They arrested him at the camper site that's located -- I

22   believe it was 821 -- I don't have the exact address -- 821

23   West Broadway.

24   Q.   Is that in the city of Williston?

02:19   25   A.   Yes, in the city of Williston.

**Q.**   Can you give the Court a description of what's located on
that property?

**A.**   There's an actual house there, and in the yard there's
approximately five campers, two of which are -- I believe two
of which are RVs, two are pull-along -- or two are popup, two
are pull-along, and one is an RV.

**Q.**   So there's an RV.  When you say pull-along or popup,
you're talking about campers?

**A.**   Yes, so they're all campers.

**Q.**   And Mr. White was located at that property?

**A.**   That is correct.

**Q.**   When the Williston Police Department made contact for that
arrest, did they also determine there was a surveillance system
set up on this property?

**A.**   That's correct.

**Q.**   Can you describe what that consisted of?

**A.**   That there was a -- that there was cameras, you know,
obviously set up, as well as a TV monitor that they -- that
they seized that was connected to this surveillance system.

**Q.**   Had the Williston Police Department attempted to conduct
some surveillance at that location prior to the arrest being
conducted?

**A.**   That is correct.  Approximately -- I believe it was the
day before they actually went out to do some surveillance and
take some photos.

1   **Q.**   And while they were doing that, were the agents confronted

2   by an individual on the property?

3   **A.**   That's correct.  They were -- while they were out there,

4   James Odeneal approached their vehicle and asked what they were

02:21   5   doing.  And they asked him, you know, who he was, for

6   identification, and he gave them the wrong name.

7   **Q.**   He gave them a false name.

8   **A.**   That's correct.

9   **Q.**   Did they take him into custody at that time?

02:22   10   **A.**   No, they did not.

11   **Q.**   And then they later returned to make the arrest?

12   **A.**   Correct.

13   **Q.**   At the time of Tyler White's arrest, did he have any

14   weapons on his person or have access to any weapons?

02:22   15   **A.**   Yes, he did.  He had a gun on his hip, a handgun that was

16   on his hip, and he also had a shotgun that was located in his

17   camper as well, sawed-off shotgun.

18   **Q.**   Sawed-off shotgun.

19   **A.**   That correct.

02:22   20   **Q.**   In his camper?

21   **A.**   That is correct.

22   **Q.**   And you said he had a pistol on his hip.  How did he have

23   a pistol on his hip?

24   **A.**   It was holstered on his hip.

02:22   25   **Q.**   Do you recall what kind of pistol that was?

13

1   **A.**    I believe -- I believe a Bersa.

2   **Q.**    Was Mr. White interviewed by the Williston Police

3   Department?

4   **A.**    Yes, he was interviewed as well.

02:22   5   **Q.**    He was provided with his Miranda warning, agreed to speak

6   to them?

7   **A.**    That is correct.

8   **Q.**    Did Mr. White provide some information about what he knew

9   of the assault of Mr. Osterhout?

02:23   10   **A.**    Yes, he did, he described it.

11   **Q.**    Can you tell the Court what Mr. White described had

12   occurred and what his involvement was?

13   **A.**    In regards to the incident with Robert Osterhout, he's

14   referred to by them as Bobby, so -- but I guess he told them

02:23   15   that Bobby went to go and purchase meth from them, and that's

16   kind of how they first came in contact with him.  While Bobby

17   was there at one time, he was -- he was taken into a camper

18   where Nick and Zac were in, and the lights were out in it.  He

19   heard the -- he heard a taser go off inside, so he poked his

02:24   20   head inside to see, you know, what was going on, and he saw

21   that Bobby was being beaten by Nick and Zac.  And they told him

22   to get outside and watch -- watch the area, so he went back

23   outside, and it continued on.

24        Then I guess Jeff went to the -- I guess he told them

02:24   25   that Jeff went there as well, Jeff Butler, and he went inside

14

1    the camper once or twice, and then after -- after which James
2    also was there.

3    **Q.**    James who?

4    **A.**    James Odeneal.  He also, I guess, went to the trailer, and
5    they told him to get outside as well.  After that Jeff went
6    into the -- Jeff basically went into the camper and told them
7    to get rid of him, and at that time James and Tyler went to go
8    get plastic from James' place and brought the plastic back, and
9    Zac and Nick wrapped up Bobby's body.  And you have to remember
10   I interviewed him as well too, so I'm trying to stick with what
11   they gave me as opposed to what I have as well.

12   **Q.**    All right.

13   **A.**    So they wrapped him up in plastic.  At the time I believe
14   Bobby was still kicking and moving, and Nick and Zac loaded
15   Bobby into the trunk of a car.  Then Tyler got in the vehicle.
16   Jeff got in the vehicle.  James and Nick, they all got in the
17   vehicle as well, and they drove west from Williston, and they
18   drove for a while.

19         Once they -- once they got out to a dirt road --
20   yeah, they got out to a dirt road after driving for a while,
21   and Bobby jumped out of the trunk of the car, and they went and
22   chased him down.  At that time, what he told Williston was that
23   he was told to stay with the car, so he stayed with the
24   vehicle, and Jeff, Nick and James -- or, no, Jeff, Nick and --
25   Jeff, Nick and Zac went after Bobby.

02:24
02:25
02:26
02:26
02:27

15

1          THE COURT:  Hold on just a moment.  Okay.  Go ahead.

2          THE WITNESS:  So Jeff, Nick and Zac went after Bobby,

3     and Tyler stayed with the car.  Approximately 20 minutes later

4     they came back to the vehicle and they drove really quickly

02:27   5     back home.

6     Q.   (MR. VOLK CONTINUING)  And did he indicate what happened

7     when they -- when you say "back home," you mean back to

8     Williston?

9     A.   Yes, back to Williston.

02:27  10     Q.   Did Mr. White explain what happened when they got back to

11     Williston?

12     A.   Yes, he said that Zac took everyone's clothes and he

13     burned them.  And the reason why James didn't go with them is

14     because he had to watch the yard while everyone else was gone,

02:28  15     the yard meaning the campsite.

16     Q.   Did Mr. White indicate what happened to the plastic that

17     was used to line the trunk?

18     A.   Yes, they burned that as well with the clothes.

19     Q.   Just to be clear, Mr. White indicated he did what with the

02:28  20     plastic material during his -- during his interview with the

21     Williston Police Department --

22     A.   Yes.

23     Q.   -- what did Mr. White indicate that he was doing with the

24     plastic material?

02:28  25     A.   He assisted -- he assisted with helping James move it over

1 to where Bobby was.

2 **Q.** And that plastic material, what else was done with it?

3 **A.** Bobby was wrapped up with it.

4 **Q.** Was there anything done to the car with that plastic

02:29 5 material?

6 **A.** Yes, James -- he said James lined the trunk of the vehicle

7 with the plastic.

8 **Q.** And at the time, just prior to them -- to Mr. White

9 obtaining that plastic material, did he indicate that he was

02:29 10 aware that Mr. Osterhout was being assaulted?

11 **A.** That is correct.

12 **Q.** He had actually looked in?

13 **A.** You're saying James?

14 **Q.** I'm sorry, Mr. White.

02:29 15 **A.** Mr. White, yes.  Yes.  Tyler, yes, he poked his head in,

16 saw what was being done after he heard the taser go off, saw he

17 was being beaten.

18 **Q.** All right.

19 **A.** And was told to get out and watch.

02:29 20 **Q.** Now, you indicated that you had some further contact with

21 Mr. White later on?

22 **A.** That's correct.

23 **Q.** You obtained a federal Criminal Complaint for his arrest?

24 **A.** That is correct.

02:29 25 **Q.** And did you actually pick up Mr. White from Williston on

1    September 5th of 2012?

2    **A.**    Yes, among others.

3    **Q.**    And was he transported to Minot?

4    **A.**    That is correct.

02:30    5    **Q.**    And you were the one that transported him during that

6    trip, is that right?

7    **A.**    Yes.

8    **Q.**    And it's during that time that you had additional

9    discussions with Mr. White?

02:30    10    **A.**    Yes.

11    **Q.**    During -- was he provided with a Miranda warning before

12    those discussions?

13    **A.**    Yes, he was.

14    **Q.**    And during that trip, did Mr. White advise you anything

02:30    15    further about the gun or guns that he had access to?

16    **A.**    Yes.  I asked him specifically about the -- about the

17    weapon and the other weapons that were found during the search

18    warrant, and he advised that Jeff Butler provided them all with

19    weapons, with guns.

02:30    20    **Q.**    What was the purpose of that?

21    **A.**    You know, we talked about the gun and, you know, about,

22    "You know what that's used for."  And he said, well, no, his

23    intentions weren't ever to kill anybody, but just for

24    intimidation and for protection.

02:31    25    **Q.**    Did Mr. White indicate that there was any drug activity

1   ongoing?

2   **A.**   Yes.

3   **Q.**   What did he say about that?

4   **A.**   He said -- he basically talked about how they had -- they

02:31   5   had a group of people which, you know, they called the family,

6   but among others was specifically four of them, which they

7   called themselves the four horsemen.  That was Jeffrey Butler,

8   that's Nicholas Woodford, James Odeneal, and that's Tyler

9   white, and those were supposedly the -- he said the four

02:31   10   horsemen, and they -- what they mainly did was sell meth.

11           He said that him -- everybody in the group had

12   specific roles.  Jeff's role -- Jeffrey Butler's role, he was

13   basically the leader and the money man.  He controlled all the

14   money.  He's the one who got the dope or got the meth, and he

02:32   15   would get the meth from two other individuals.  And Jeff would

16   give it to -- Jeff would give it to Tyler, who Tyler said his

17   role was the weight man, where he would weigh everything out

18   and package it so they could distribute it.  Tyler specifically

19   said that that was -- Jeff was the only one -- or Tyler was the

02:32   20   only one that Jeff trusted to be in charge of that process, so

21   he would package it up.  He would weigh it out, package it up,

22   and then they would all sell.

23           He told me that he would sell approximately like a

24   half an ounce a day, but the total of the whole group that was

02:33   25   selling, they would sell approximately two ounces every other

19

1  day.  He gave -- I also asked him about a street value of, you

2  know, what he was charging for these ounces, and he said

3  between 5,000 and 5,600 dollars an ounce.  And I asked him,

4  "Well, what is your total that you would make in a week,

02:33  5  approximately?"  And he proceeded to say between 20 to 40

6  thousand dollars.

7  Q.  During your -- either your or the Williston P.D.

8  interviews with Mr. White, did he describe how it was that he

9  ended up coming out to live at this property?

02:33  10  A.  Yes.  He met Jeffrey Butler in Trinity Hospital in Minot.

11  Jeff (sic) had some injuries to his arm, and he was in the

12  hospital, and I guess in the same room with him was Jeffrey

13  Butler, who also had injuries to his neck at the time, so they

14  met up and got talking to each other.  And then Tyler had a

02:34  15  fight with his family, and Jeff offered for him to move out

16  there with him, so that's how he got hooked up with Jeff.

17  Q.  All right.  Do you see Mr. White in the courtroom today?

18  A.  Yes.

19  Q.  Can you identify for the Court which individual is

02:34  20  Mr. White?

21  A.  He's the gentleman with the Chicago Bulls jersey, Michael

22  Jordan.

23  Q.  Was Nicholas Woodford one of the individuals who was also

24  arrested by the Williston Police Department on this property?

02:34  25  A.  That is correct.

1  **Q.**   And "on this property" meaning the 821 West Broadway?

2  **A.**   That's correct.

3  **Q.**   At the time of his arrest, did Mr. Woodford have or have

4  access to any weapons?

02:35

5  **A.**   Yes.  When they were doing the search, they went up to --

6  they went up to a camper that was there, located at the edge of

7  the property.  And when detectives were out there, they looked

8  in the window and they saw that he was crouched down by the

9  door.  When they were finally able to have him answer the door,

02:35

10  they asked him, you know, "What were you doing?"  They searched

11  -- you know, they searched it.  They found a gun.  They asked,

12  you know, where was this gun -- you know, I mean, or what's

13  this gun all about?  And he proceeded to tell them that he had

14  the gun on him while they were doing the search, and as soon

02:35

15  as -- or before they were doing the search, but as soon as he

16  saw cops come by his window, he took the gun off of his hip and

17  placed it in a drawer.

18  **Q.**   What kind of gun was this?

19  **A.**   I believe it was a Ruger.

02:36

20  **Q.**   A handgun?

21  **A.**   Handgun.  Sorry.  Yeah.

22  **Q.**   Was Mr. Woodford interviewed by the Williston Police

23  Department?

24  **A.**   That is correct.

02:36

25  **Q.**   And you've had occasion to review that interview?

1  **A.**   Yes, I have.

2  **Q.**   Did Mr. Woodford explain what had happened with Mr.

3  Osterhout?

4  **A.**   Yes, he did.

02:36   5  **Q.**   What did he say?

6  **A.**   Okay.  He basically said that Bobby, Robert, was there

7  twice that day.  He was there once in the day -- daytime and he

8  was basically just freaking out, talking about the FBI

9  following him and just acting bizarre, so they escorted him off

02:37   10  the property.  Then the -- he came back that evening.  Again,

11  they asked him to leave.  He didn't want to leave the property,

12  so Nick said that they had just got done doing -- or he had

13  just got done doing a gram of meth and he was feeling pretty

14  powerful -- pretty powerful, pretty high, so they said that --

02:37   15  or he said that he basically just beat up -- beat up Bobby with

16  Zac.  He -- sorry.

17  **Q.**   Did Mr. Woodford indicate whether he was taking any

18  pleasure out of beating up Mr. Osterhout?

19  **A.**   Oh, yeah, he said that -- I mean, he was pretty brazen

02:38   20  about it in his interview that they -- you know, he whooped --

21  he whooped the shit out of him and it felt good, you know, but

22  he said it was something that wouldn't be fun to someone who's

23  sober, but he wasn't sober.

24  **Q.**   Did he indicate that the further he and Zac got into it,

02:38   25  the more fun they had beating up Mr. Osterhout?

1    **A.**    Yeah.  He basically, yeah, was just talking about how, you

2    know, it just started as a -- like a beat-down, and then it

3    just started to go too far, but he wasn't stopping it.

4    **Q.**    Did he indicate whether any weapons were utilized to

02:38    5    assault Mr. Osterhout?

6    **A.**    He talked about -- he talks a lot about assaulting him

7    brutally.

8    **Q.**    Let me clarify the question.

9    **A.**    Yeah, if you could.

02:39    10    **Q.**    Did he indicate that there were weapons used by either he

11    or Zac Mills?

12    **A.**    Yeah.  I mean, he talks about at one point that Zac was --

13    Zac was the kind of guy that didn't like to use his hands, and

14    so he used a taser on Bobby.  He also talked about how he liked

02:40    15    to put cigarettes out on people as well.

16    **Q.**    Did he indicate that he had also utilized brass knuckles,

17    that Mr. Mills had used the brass knuckles?

18    **A.**    I believe so, yes.

19    **Q.**    Did Mr. Woodford indicate what happened with Bobby, the

02:40    20    victim, after he was assaulted at the camper in Williston?

21    **A.**    Yes.  I mean, at first he was saying that, you know, he --

22    after beating him up, he said he just stayed back there and

23    just got high, but after more talking with the detective, he

24    indicated that Jeff, Tyler, himself and Zac all drove out to

02:41    25    Montana with Bobby in the trunk of the vehicle.

1   **Q.**   Did he indicate how Bobby got in the trunk of the vehicle?

2   **A.**   Yeah, he said that -- he said -- he said Zac and James put

3   Bobby in the trunk of the vehicle.

4   **Q.**   Did Mr. Woodford indicate where they drove to?

02:41   5   **A.**   Yes, he said that -- when he actually revised what he was

6   saying, that they drove out to Montana.

7   **Q.**   And did he indicate what happened out in Montana?

8   **A.**   Yeah, he said that they got out to Montana and that Bobby

9   jumped out of the back of the trunk, started to run.  He said

02:42   10   that -- that they ran after him and that they started stomping

11   him.  They started stomping his neck and beating him up.  He

12   said at one point that he used his sweatshirt string to choke

13   -- to try to choke Bobby and to -- and to save him, but it

14   broke, so he said that everyone that was there, their hands

02:42   15   went around Bobby's throat.  And it goes on to say that he

16   couldn't control what was going on and that -- you know, he

17   said that they basically whooped his -- they whooped his butt

18   again.

19            And he said that was only supposed to be -- at first

02:43   20   his part of it was just whooping his butt.  But, you know, the

21   detective asked, "Well, you know, why were you guys doing

22   this?"  And he said that he was told to because Bobby knew too

23   much and he was just a witness to what he went through.  And

24   then the detective proceeded to ask, you know, "Well, what did

02:43   25   he just go through?"  And he said, you know, the butt whooping

1  that they gave him.  Then he said it was an attempt, and it was

2  a botched attempt, but it was an attempt.  And the detective

3  asked, you know, "Was it an attempt at murder?"  And Nick

4  looked at him and indicated yes.

02:43

5  Q.   Okay.  Do you see the person you know as Nicholas Woodford

6  in court today?

7  A.   Yes.

8  Q.   Please point him out and described what he's wearing today

9  for the Judge.

02:44

10 A.   He's the gentleman in the flannel shirt, sleeves rolled

11 up.

12 Q.   Was James Odeneal another one of the individuals who was

13 arrested at the 821 West Broadway --

14 A.   That's correct.

02:44

15 Q.   -- address in Williston?

16 A.   That's correct.

17 Q.   At the time that he was arrested at that property, did

18 Mr. Odeneal have any weapons on his person or accessible to

19 him?

02:44

20 A.   Yes.  Police found brass knuckles in his pocket, and he

21 indicated that they weren't his, though.

22 Q.   Did he say whose they were?

23 A.   I'm not sure.

24 Q.   That's fine.  During the time that the officers were at

02:45

25 the property, did Mr. Odeneal identify which camper was his?

1   A.   Yes, during -- throughout the course of -- throughout the

2   course of multiple interviews with him, he indicated that it

3   was his camper that was used in the beating of Bobby.

4   Q.   And that was what's called a Bethany brand popup?

02:45   5   A.   Yeah, popup camper, correct.

6   Q.   And did the Williston Police Department conduct a search

7   of that camper?

8   A.   Yes, they did, based on the information that they received

9   from him and the account of saying that there was -- there was

02:46   10   blood on the cushions and on the -- on the curtains and that

11   they tried to clean up the blood.  Based on that information,

12   they were able to obtain a search warrant and view that for

13   themselves.

14   Q.   Did they observe blood inside of that camper?

02:46   15   A.   That is correct.  They actually took some as evidence as

16   well, from the screen.

17   Q.   Did the officers who conducted the search also locate any

18   drugs or drug paraphernalia in that camper?

19   A.   Yes, at the time of the search.

02:46   20   Q.   What kinds of things were found in the camper, do you

21   recall?

22   A.   I really -- I mean, in each place that they searched, they

23   found drugs, they found drug paraphernalia, and they found

24   weapons.

02:46   25   Q.   Did they find money?

1    **A.**    That is correct.  They found money too, as well.

2    **Q.**    What kind of money did they find?

3    **A.**    I believe it was in Jeffrey -- in Jeffrey Butler's camper

4    they found -- they found five -- five stacks consisting of five

02:47    5    $20 bills in each stack, and they also found a couple hundred

6    dollar bills as well.

7    **Q.**    Did they find razor blades in Mr. Odeneal's camper?

8    **A.**    That's correct.

9    **Q.**    And Mr. Odeneal was interviewed by the Williston Police

02:47    10    Department?

11    **A.**    Yes, he was multiple times.

12    **Q.**    Multiple times.  Okay.  During his initial interview, did

13    Mr. Odeneal indicate where he had come from, how long he had

14    been in North Dakota?

02:47    15    **A.**    Yes, he said that he was originally from Fresno,

16    California, and that he had only -- he had only been in North

17    Dakota for close to a year, couple months to a year, and that

18    he had been working at Hardee's, and before he came in contact

19    with Jeff or anybody, he was homeless, sleeping in his car.

02:48    20    **Q.**    Did he indicate that he was a methamphetamine user?

21    **A.**    Yeah.  Yeah, he said he had been using since he was

22    13 years old.

23    **Q.**    During the second interview with -- I'm sorry?

24    **A.**    If I can -- if I can advise, during that interview, that

02:48    25    is when Odeneal said that Nick had him hold the brass knuckles

27

1    for him.

2    **Q.**   All right.  During that first interview, did Mr. Odeneal

3    indicate that he was aware of any of this assault taking place

4    with respect to Mr. Osterhout?

02:49  5    **A.**   No, he -- during the interviews themselves, no, but

6    afterwards, after the second interview when they left the

7    interview room, he began crying and told the officer that his

8    only part in the kidnapping was that he lined the trunk with

9    plastic.

02:49  10   **Q.**   Lined the trunk of a vehicle?

11   **A.**   Yes.

12   **Q.**   Did he identify what vehicle this was, did he or any of

13   the others?

14   **A.**   Yes.  Yes, they did.

02:49  15   **Q.**   What vehicle was that?

16   **A.**   It was a four-door -- four-door gray vehicle.

17   **Q.**   Whose vehicle was that?

18   **A.**   Jeffrey Butler's.

19   **Q.**   During the time when -- after the conclusion of the second

02:50  20   interview, when Mr. Odeneal was describing that his conduct

21   involved lining the trunk of this vehicle, did he indicate that

22   he was afraid in any way?

23   **A.**   Oh, the second -- yes, he said that he was afraid, you

24   know, what was going to happen to him.  He didn't want to be

02:50  25   around these guys anymore.  He wanted to change his name.

1   Q.   And he was interviewed for a third time as well, is that

2   correct?

3   A.   That's correct.

4   Q.   On this third occasion did he go into further detail about

02:50   5   -- in reference to the assault of Mr. Osterhout?

6   A.   Yeah, he basically -- I mean, he started off by saying

7   that, you know, Jeff said he would take full responsibility for

8   everything that occurred on that day, and that he stated that

9   he was not with them when they took Bobby, and that his -- his

02:50   10   part was just to line the trunk with plastic wrap.  He said

11   that the plastic wrap that they used was actually his plastic

12   wrap from his camper.

13   Q.   Did he indicate that he had observed the assault occurring

14   in his camper of Mr. Osterhout?

02:51   15   A.   In the interview that I did with White, I mean, he

16   indicates that he did see what was going on.

17   Q.   Tyler White told you.

18   A.   Yes, that's correct.

19   Q.   During the interview of Tyler White, he indicated that?

02:51   20   A.   Yes.

21   Q.   Did Mr. Odeneal indicate that he had to remove anything

22   out of the trunk of the car before plastic was lined in there?

23   A.   Yes, he took -- he took items out of the trunk of the

24   vehicle so he could line it with the plastic.

02:52   25   Q.   And once that was done, what happened at that point?

29

1    A.    And then they just basically -- he said that they

2    basically -- he didn't want to know what was going on.  He

3    didn't want to know what they were doing, and that they told --

4    they told him that they took him somewhere in Montana, took

02:52    5    Bobby to somewhere in Montana.  And then he also indicated that

6    Nick, while they were out there, Nick Woodford dropped his

7    cellphone out in Montana when they were out there with Bobby.

8    Q.    Was Mr. Odeneal picked up with the others during the

9    course of the -- after the federal Criminal Complaint had been

02:53    10    issued?

11    A.    That is correct.

12    Q.    And did you make contact with him out in Williston?

13    A.    Yes, which each individual that came out, one of us from

14    the -- one of us from the FBI told them who we were, that they

02:53    15    were being arrested on a federal charge of kidnapping.  Well, I

16    told James, when it was his time to come out, who I was, that

17    he was being arrested on a federal offense of kidnapping, and

18    he proceeded to say, "I never kidnapped anybody.  All I did was

19    line the trunk with plastic."

02:53    20    Q.    You spoke with the Williston Police Department detectives

21    about a tattoo that Mr. Odeneal has on his person?

22    A.    That is correct.  They asked him during one of their

23    interviews about the tattoo that he has on him.  It's a tattoo

24    of Number 23.  He indicated that that was a tattoo of the

02:54    25    Peckerwoods gang, which is a -- which is a known White

1   supremacist prison gang.

2   Q.   Did he indicate that he was affiliated with that group in

3   some way?

4   A.   With the tattoo.

02:54   5   Q.   Mr. Butler, was he spoken with during the course of this

6   investigation?

7   A.   Yes, he was.

8   Q.   And when was that?

9   A.   He was spoken with when he was transported, when we

02:55   10   arrested everybody and he was transported.

11   Q.   Did he indicate there was some drug distribution going on

12   amongst this group of individuals?

13   A.   That is correct.

14   Q.   Can you briefly describe what it is that he talked about?

02:55   15   A.   He just basically described that they were selling meth.

16   He talked about who he was getting it from and, you know, that

17   it was -- you know, he was the leader.  It was his

18   organization, his group, and they were just selling drugs, or

19   meth specifically.

02:55   20   Q.   During the course of time -- the course of this

21   investigation and the interviews of the various individuals,

22   was there any indication that Mr. Butler had directed any of

23   these individuals to kill Bobby, Mr. Osterhout?

24   A.   Yes, a few people stated to -- Zachary Mills, I believe he

02:56   25   was told to -- they were told that they needed to go and chase

31

1   after Bobby when he jumped out of the trunk when they were in

2   Montana and kill him or that he would have them killed.  He --

3   also with Tyler White, you know, when they first went out

4   there, Tyler was -- Tyler was thinking -- at least what he

02:56   5   explained to me, he was thinking that the intention was just to

6   drop him off, but when Bobby jumped out of the trunk, Jeff

7   directed all of them to go and kill him.

8   **Q.**   Did Mr. Mills, during the course of his interviews with

9   Montana or Oregon authorities, indicate that he believed Mr.

02:57   10  Osterhout was actually dead at the time they left him?

11  **A.**   Yes.

12  **Q.**   What did he say with respect to that?

13  **A.**   He basically said that -- that they beat him up out there

14  and that they stomped on his neck until he stopped gurgling,

02:57   15  and they left him there because they thought he was dead.  All

16  of them that were there thought he was dead, so then they left.

17  **Q.**   Do you see the person that you know as James Odeneal in

18  court today?

19  **A.**   That is correct.

02:58   20  **Q.**   Would you describe what he's wearing, point him out?

21  **A.**   Yeah, he's the gentleman wearing the black shirt with the

22  rolled-up sleeves.

23         MR. VOLK:  All right.  That's all I had, Your Honor.

24         THE COURT:  Mr. Glass, I'm going to allow you to

02:58   25  examine first, and you let me know when you need to leave.

32

1                            CROSS-EXAMINATION

2    BY MR. GLASS:

3    Q.   Officer Frank --

4         THE COURT:  If you could pull the microphone up or

5    speak a little bit louder.

6    Q.   (MR. GLASS CONTINUING)  Okay.  Mr. Osterhout, he walked to

7    a residence in Montana, is that correct?

8    A.   That's correct.

9    Q.   Okay.  And did he say exactly where he was first

10   assaulted?  Was that in -- was he assaulted in Montana both

11   times, or was one time in North Dakota?  I kind of missed out

12   on that.

13   A.   The way that we know that he -- the way that it came to

14   light that he walked is through his interview with police out

15   there.  When I interviewed him as far as the beating and

16   everything, he said that he was assaulted here in North Dakota.

17   Q.   Did Mr. White -- in any interviews, did anybody claim

18   Mr. White had participated in assaulting Mr. Osterhout in North

19   Dakota?

20   A.   Yes, that is correct.  The victim actually indicated that.

21   Q.   Okay.  I believe you had testified there were two

22   individuals that assaulted him in the camper, correct?

23   A.   Among others, yes.

24   Q.   Okay.  What was Mr. White's role when they were at the

25   camper?  Do you recall what they had told you in the

                                  33

1   interviews?

2   A.   Well, we just -- let's see.  According to the -- according

3   to the victim, the victim states that Tyler was one of the

4   people that were actually kicking him while they were in the --

5   while they were in the camper.  At one point he was -- the

6   victim was stood up by another individual.  Another individual

7   and Nick and Tyler kicked him in the face, and they made fun of

8   it like it was -- and said that it was like punting a football,

9   and he said that he thought he broke his nose, and that's what

10  the victim indicates.

11  Q.   At what point then during your interviews did you decipher

12  that Mr. White was to be a lookout?

13  A.   Okay.  There was one interview that took place with Zac

14  Mills out in -- I believe that was one in Montana because

15  Mr. Mills was interviewed twice, once in Montana and once in

16  Oregon.  Now, in regards to him being a lookout in -- are you

17  asking for in North Dakota or in Montana because there's two

18  different times?  The one in North Dakota -- I mean the one in

19  Montana, Zac says that he and Tyler were told to watch the car,

20  but then Zac goes on to saying that -- when he's interviewed in

21  Oregon, that he actually participated in the beating out in

22  Montana, but Tyler was still to watch, be a lookout.

23  Q.   Okay.  So in Montana, Mr. White was a lookout allegedly.

24  A.   Allegedly.  And then as far as North Dakota -- like I

25  said, there's a lot of interviews.  Yes, in the interview with

34

1   Williston Police Department, he witnesses Nick and Zac doing

2   the beating.  They told him to -- they told him to get --

3             MR. TUNTLAND:  I'm sorry, Your Honor.  I can't

4   follow.  It was a witness, he told them.  Can we have some

03:04   5   identification of the hearsay declarant?

6             THE COURT:  Go ahead, and if you could start your

7   answer again and identify who's speaking.

8             THE WITNESS:  Okay.  I couldn't understand what he

9   was saying, but I don't understand.

03:04   10            THE COURT:  Okay.  Go ahead and recite -- give your

11   answer, but identify who's providing the information.

12            THE WITNESS:  Oh, understood.  Okay.  So Tyler White

13   is providing this information to Officer Zimmerman of Williston

14   Police Department during their interview.  And during the time

03:05   15   when Bobby was being beaten in the camper, White tried to look

16   in a few times to see what was going on, and they told him, no,

17   to stay outside and to watch the yard.

18            MR. GLASS:  I have no further questions, Your Honor.

19            THE COURT:  Mr. Tuntland.

03:05   20            MR. TUNTLAND:  Thank you, Your Honor.

21                        CROSS-EXAMINATION

22   BY MR. TUNTLAND:

23   Q.  First off, Mr. Frank, you've been reading and referring to

24   notes on a -- it looks like a yellow legal pad, is that right?

03:06   25   A.  Yes.

1   **Q.**   Okay.  Now, were those notes that you were writing while

2   you were interviewing people?

3   **A.**   No, they're after-the-fact notes.

4   **Q.**   They're after-the-fact notes?

03:06   5   **A.**   Yeah.

6   **Q.**   Did you maintain your own notes of interviews?

7   **A.**   No.

8   **Q.**   Did you record any of your interviews?

9   **A.**   I did not.  Williston P.D. recorded interviews, as well as

03:06   10   FBI out in Oregon, as well as we had an agent here that also

11   recorded an interview as well.

12   **Q.**   Okay.  Now, you started your testimony by talking about

13   Bobby or Robert Osterhout being, quote, taken to a campsite.

14   What did you understand "taken" to mean?

03:07   15   **A.**   Okay.  Well, in the interview that I did with him on

16   August 16th, he said that he was with a -- I believe he said he

17   was with a -- he was with a Ryan.  Yeah, he was with a Ryan,

18   someone that he used to work with, and he asked Ryan to drop

19   him off at the campsite.

03:07   20   **Q.**   Oh, okay.  So it wasn't an involuntary action.  Somebody

21   dropped him off at the campsite?

22   **A.**   Yes.  Yeah, like he voluntarily went to the campsite.

23   **Q.**   Okay.  Now, I was intrigued by this campsite.  It sounds

24   like a pretty trashy place.  Was it?

03:07   25   **A.**   I didn't go.  I did never go there.

36

1    **Q.**    You never have been there?

2    **A.**    No, I have not.

3    **Q.**    Have you ever looked at any pictures of the place?

4    **A.**    No, I have not.

03:08    5    **Q.**    I was wondering -- you were talking about it being

6    reported that the people living there were earning $5,000 a

7    week or better from their drug sales?

8    **A.**    They were earning money, but what I was told was 20 to 40

9    thousand dollars a week.

03:08    10    **Q.**    Twenty to forty thousand a week, and they were living in

11    campers.

12    **A.**    That's correct.

13    **Q.**    Two of them were soft-sided campers?

14    **A.**    Correct.

03:08    15    **Q.**    Two of them were hard-sided campers?

16    **A.**    I believe so.

17    **Q.**    And one of them was a motor home.

18    **A.**    I believe so.  Like I said, I wasn't out there.  This is

19    just all that I'm hearing from my -- the reports.

03:08    20    **Q.**    Did you check the ownership of the camper that was

21    identified as belonging to James Odeneal?

22    **A.**    No, I have not.

23    **Q.**    You didn't check with -- was it registered in North

24    Dakota, do you know?

03:09    25    **A.**    I don't know.

37

1   **Q.**   Now, Zac Mills talked to the Yellowstone County Sheriff.

2   I believe that was the first break you had in the case, is that

3   right?

4   **A.**   With Zac Mills, when you -- I mean, we talked to -- we

03:09   5   talked to the -- I talked to the victim.

6   **Q.**   You talked to the victim?

7               THE COURT:  Hold on just a moment.  Mr. Glass?

8               MR. GLASS:  Your Honor, I've got to get going to that

9   other hearing at 3:30.

03:09   10               THE COURT:  Okay.

11               MR. GLASS:  I hate to, if you don't mind.  That's

12   what I told him last week.

13               THE COURT:  Right.  Right.  No, I understand.  What

14   I'm going to do with regard to your defendant -- are you

03:10   15   available tomorrow?

16               MR. GLASS:  I am.

17               THE COURT:  Are you concerned about any of the other

18   testimony here today?  Well, I know you're concerned, but --

19               MR. TUNTLAND:  Well, we're going to point the finger

03:10   20   at --

21               MR. GLASS:  You know, if need be, I guess I could get

22   a transcript, or something.  I'll talk to Tom and -- or

23   Mr. Tuntland and Mr. Espeseth tomorrow and see if there's

24   anything else.

03:10   25               MR. TUNTLAND:  I can come back tomorrow, Your Honor,

38

1    if you want to recess.

2              THE COURT:  What's your availability tomorrow, Mr.

3    Espeseth?

4              MR. ESPESETH:  What time of day are you looking at,

03:10    5    Your Honor?

6              THE COURT:  Well, let's talk about when everybody

7    would be available.

8              MR. TUNTLAND:  It's my birthday.  I'm available all

9    day.

03:11   10              THE COURT:  How about you?

11              MR. GLASS:  Any time.  Tomorrow morning preferably,

12    Your Honor.  My calendar is wide open tomorrow morning.

13              MR. ESPESETH:  And I have an appointment in the

14    morning.  If I could reach that person, I could try to get him

03:11   15    rescheduled, but that's scheduled from 9:30 to roughly 11:00,

16    and then I have somebody coming late tomorrow afternoon at

17    4:00, but once again, that's just an appointment.  I could also

18    try to reach that person to accommodate schedules.

19              THE COURT:  Who's not available in the afternoon, or

03:12   20    is everybody available in the afternoon?

21              MR. ESPESETH:  I have an appointment at 4:00.

22              THE COURT:  No, but, I mean, would 1 o'clock work,

23    Mr. Glass?

24              MR. GLASS:  One o'clock would be fine.

03:12   25              THE COURT:  Well, I guess I do have a little concern

39

1   here regarding the defendant's right to have his counsel

2   present during the preliminary hearing, and I was hoping we

3   would maybe get through, but I guess that was probably too much

4   optimism on my part, that we could finish the preliminary

03:12   5   hearing portion and then maybe take up the detention part

6   separately, but I think what we'll do is continue all of the

7   hearings until tomorrow at 1 o'clock, if that's acceptable with

8   everybody.  Court is adjourned.

9       (A recess was taken from 3:12 p.m., Monday, September

10   10, 2012, to 1:04 p.m., Tuesday, September 11, 2012.)

11       - - - - - - - - - -

12       (The above-entitled matter came before the Court, The

13   Honorable Charles S. Miller, Jr., United States District Court

14   Magistrate Judge, presiding, commencing at 1:03 p.m., Tuesday,

15   September 11, 2012, in the United States Courthouse, Bismarck,

16   North Dakota; with counsel appearing on behalf of the

17   respective defendants as hereinbefore indicated.  The following

18   proceedings were had and made of record in open court with

19   Defendant Woodford, Defendant White, and Defendant Odeneal

01:03   20   present:)

21       THE COURT:  We'll go back on the record in

22   Magistrate's Number 4-12-152, United States of America versus a

23   number of defendants.  Present in court is Mr. James Odeneal

24   and his counsel, Mr. Tuntland.  Mr. Tyler White and his

01:04   25   counsel, Mr. Glass, is present.  And Mr. Woodford and his

40

1    counsel, Mr. Espeseth, is present.  Mr. Volk is here on behalf

2    of the United States.  Mr. Hagler is here on behalf of the

3    United States as well.

4         We're continuing with the hearing -- the preliminary

5    hearing and also the combined hearing on the issue of release

6    or detention.  I think when we left off yesterday, Mr.

7    Tuntland, you were questioning.  You may resume.

8         MR. TUNTLAND:  Thank you, Your Honor.

9                        TERRENCE FRANK,

10   having been previously sworn, was examined and testified

11   further as follows:

12   Q.   (MR. TUNTLAND CONTINUING)  Now, Mr. Frank, you testified

13   yesterday that when agents came to this yard where the five

14   campers were, they were confronted, was the word you used, by

15   James Odeneal.  Were you there?

16   A.   No, sir, I was not.

17   Q.   Okay.  The report of the confrontation doesn't indicate

18   any threats to use violence on Mr. Odeneal's part, is that

19   right?

20   A.   Not to my knowledge.

21   Q.   Actually, all he did was ask people why they were there?

22   A.   As far as I know.

23   Q.   Okay.  And it was your testimony that from the statements

24   that were taken when Bobby was taken into the camper, the

25   lights were out, is that right?  They were put out?

41

**A.**   Yes, that's --

**Q.**   Do you know if they were out when he entered or if they were turned off after he entered?

**A.**   I'm not sure.

**Q.**   Okay.  It was dark outside, is that right?

**A.**   I'm not sure.  I wasn't there.

**Q.**   Okay.  And then you said, quote, James was also there and he was told to get out.  Who told you -- who said that to you?

**A.**   I'm going to have to refer to the notes.

**Q.**   Would you do that?

**A.**   Okay.  According to a -- according to the interview between Tyler White and Officer Zimmerman from Williston P.D., during the course of that interview it was noted that Tyler said that James would go knock on the door, look in to see what's going on, and so during that interview he said that James would go knock on the door and see what was going on.

**Q.**   Did you have any information, what was going on when James knocked on the door?

**A.**   Well, according to a -- according to another interview by Officer Zimmerman, again from Williston P.D., of James Odeneal, he stated to them that they used his camper for the assault.

**Q.**   Yes?

**A.**   Excuse me?

**Q.**   But that still doesn't answer me if, when James looked in, if he saw anything going on.  Do you know if he did?

42

1   **A.**   I'm not -- I'm not aware.

2   **Q.**   Okay.  Have you talked to any of these individuals

3   yourself?

4   **A.**   Yes, I did.  I interviewed Tyler White.

01:08   5   **Q.**   Anybody else?

6   **A.**   I mean, I told them at Williston -- or at Williams County

7   who I was, what they were being arrested for.  The only thing

8   that James said to me, like I said yesterday, when I told him

9   for kidnapping, that he was being charged with kidnapping, he

01:08   10   said he didn't kidnap anybody.  All he did was line the trunk.

11   **Q.**   Okay.  Now, did any of the people accused of this crime

12   express fear of Pops Butler?

13   **A.**   That's correct.

14   **Q.**   Who did?

01:09   15   **A.**   That would be Zachary Mills.

16   **Q.**   Okay.  Anybody else?

17   **A.**   As far as Pops Butler?

18   **Q.**   Yep.

19   **A.**   No, not as far as Pops Butler.

01:09   20   **Q.**   Now, let's see.  According to Tyler, there were, quote,

21   the four horsemen dealing meth, and you mentioned Jeff Butler.

22   That's Pops Butler, is that correct?

23   **A.**   That is correct.

24   **Q.**   And Tyler said that Pops was the leader, and Tyler was the

01:10   25   weight man, and I didn't get what the names and positions of

1    the remaining two of the four horsemen were.

2    A.    So the other two -- you already mentioned Jeff.  We

3    already mentioned Tyler.  Nick was considered the enforcer, as

4    well as dealer of meth.  And James was just a user and a

01:10   5    dealer.

6    Q.    And this was according to who?

7    A.    This is according to Tyler White.

8    Q.    Okay.  So James was a user and a dealer.

9    A.    Yes.

01:11   10   Q.    Okay.  And somebody talked to Nick about his part in the

11   assault, and he said that his part in it was to whoop Bobby, is

12   that right?

13   A.    At one point with his interview with Williston P.D.,

14   Detective Dave Peterson, yes, he said that that was his role in

01:12   15   it.

16   Q.    Okay.  And you mentioned something about, Nick was told to

17   do something.  Do you recall who told him to do what in

18   relation to the assault?

19   A.    During the interview with Nick Woodford, the same

01:12   20   interview that was done by Detective Peterson, he indicates

21   that they were told to put him in the car, and he's saying --

22   and he says, "so we did."

23   Q.    Did he say who told him to do that?

24   A.    No, not that I'm aware of.

01:13   25   Q.    Now, James was interviewed two times, wasn't he -- three

44

1   times, I guess?

2   **A.**   That's correct.

3   **Q.**   But during the second interview he expressed -- he told

4   somebody that he was afraid of Pops, I believe.  Isn't that

01:13   5   what he said?

6   **A.**   According to -- after the second interview, according to

7   Detective Peterson, he states in quotes that he fucked up and

8   he is scared and wants his name changed if he tells his story

9   on camera.

01:14   10   **Q.**   Okay.

11   **A.**   And that he did -- all he did was lined the trunk with

12   plastic and loaded Bobby.

13   **Q.**   Now --

14   **A.**   So I'm not aware if he said anything else.

01:14   15   **Q.**   Okay.  I'm sorry I interrupted you.

16   **A.**   That's okay.  Sorry.

17         MR. TUNTLAND:  Did you get it?

18         THE WITNESS:  Yes.

19         MR. TUNTLAND:  Okay.  Thank you.  I was talking to

01:14   20   the court reporter.  She has trouble when we talk over each

21   other.  I try not to do that, but I'm terrible.

22   **Q.**   (MR. TUNTLAND CONTINUING)  Now, when Bobby Osterhout

23   managed to escape from the vehicle, you had some testimony that

24   Pops Butler instructed people to kill Bobby or he would have

01:15   25   them killed.  Do you remember that testimony?

45

1  **A.**   Yes.

2  **Q.**   Did you ask any of the three people that were in the car

3  in addition to Pops, in the passenger part of the car, if they

4  actually took that threat to be serious?

01:15   5  **A.**   No, I did not.

6  **Q.**   Do you know if anybody else did?

7  **A.**   Not that I'm aware of at this point.

8  **Q.**   Now, you -- if I could, the Complaint charges kidnapping,

9  in violation of Section 1201(a), Subsections 1 and 2, and 2 is

01:16   10  a special jurisdiction.  Was there any kidnapping on a

11  reservation or federal reservation that you're aware of?

12  **A.**   No, not that I'm aware of.

13  **Q.**   Any special federal jurisdiction involved?

14  **A.**   I'm not aware.

01:16   15  **Q.**   I may be reading that wrong.  That may be 18 USC,

16  1201(a)(1), and 18 USC, Section 2, which is aiding and

17  abetting, but we're not alleging anything on a reservation or a

18  federal reservation.

19  **A.**   Not that I'm aware of, no.

01:17   20  **Q.**   Okay.  Now, Mr. Osterhout was apparently wrapped in some

21  plastic and then placed inside a trunk that had been lined with

22  plastic, is that right?

23  **A.**   Yes.

24  **Q.**   Whose car -- who owned the car with the plastic-lined

01:17   25  trunk?

46

1  A.    Jeffrey -- Jeffrey Butler.  From what I've read in the

2  police reports from Williston P.D., Jeffrey Butler.

3  Q.    And from the reports, was Mr. Osterhout fighting or

4  otherwise indicating that he was alive when he was placed in

5  the trunk?

6  A.    Yes.

7  Q.    Okay.  Now, I think you testified the instructions were to

8  get rid of him, is that right?

9  A.    Yes.

10  Q.    Are you aware of any instructions to take him across state

11  lines?

12  A.    No.

13  Q.    Do you -- have you ever been able to find out where

14  Mr. Osterhout was dropped off?

15  A.    Culbertson, Montana, is the closest point of reference

16  that we have.

17  Q.    That's where he knocked on a door.

18  A.    That is correct.

19  Q.    Do you know if he was dropped off in Montana or in North

20  Dakota?

21  A.    No, the -- I mean, I was not there.  The -- that's where

22  he -- that's where he went to the house where the resident

23  called 911 that -- when the resident stated that he was all

24  bloody and beaten.  Culbertson, Montana, is located a little

25  bit a ways from North Dakota, so the logical inference would be

1    that he was taken to Montana, unless he walked.

2    **Q.**   Or hitchhiked?

3    **A.**   Excuse me?

4    **Q.**   Or hitchhiked?

01:20    5    **A.**   I can't understand you.  I'm sorry.

6    **Q.**   Or hitchhiked?

7    **A.**   Or hitchhiked?

8    **Q.**   Yep.

9    **A.**   That could be a possibility.

01:20    10   **Q.**   Or grabbed a ride on a truck?

11   **A.**   Could be a possibility.

12   **Q.**   Okay.  You just don't know, do you?

13   **A.**   Just -- no.  No, I don't.

14   **Q.**   Now, Zac Mills lost his cellphone.  Has his cellphone been

01:20    15   located?

16   **A.**   Yes.

17   **Q.**   Where was it found?

18   **A.**   Montana.

19   **Q.**   Whereabouts?

01:20    20   **A.**   On a dirt road located by the residence.  When deputies

21   out there went to go search around the area where Mr. Osterhout

22   was found or where he says in the area where he was, they

23   located the cellphone there.

24   **Q.**   Okay.  And was Mr. Osterhout interviewed to determine

01:21    25   whether or not he carried the cellphone there?  I guess it

48

1   wouldn't have mattered because he didn't even remember being in

2   Culbertson, did he?

3   **A.**   No, he did not.

4        MR. TUNTLAND:   Okay.   Thank you.   I have no further

01:21   5   questions.

6        THE COURT:   Mr. Espeseth?

7        MR. ESPESETH:   Thank you, Your Honor.

8                     <u>CROSS-EXAMINATION</u>

9   BY MR. ESPESETH:

01:21   10   **Q.**   Special Agent Frank, you indicated Culbertson is some

11   distance from the state line.   Do you know how far?

12   **A.**   No, I do not.

13   **Q.**   And the call for 911 came in to a resident in or near

14   Culbertson.   Do you know if that resident actually lives in the

01:21   15   city or outside of city limits of Culbertson?

16   **A.**   I'm not sure.

17   **Q.**   And do you know if this person living in or near

18   Culbertson lives in North Dakota or Montana?

19   **A.**   The resident who called 911?

01:22   20   **Q.**   Correct.

21   **A.**   No, not that I'm aware of.

22   **Q.**   And to follow up on a question from Mr. Tuntland,

23   Mr. Osterhout remembers waking up in, what, Trinity Hospital in

24   Minot?

01:22   25   **A.**   Yes.

49

1   **Q.**   And what did he remember -- what was the thing he

2   remembered before that, being where?

3   **A.**   He remembers being in a trunk.

4   **Q.**   In North Dakota.

01:22   5   **A.**   He was placed in a trunk in North Dakota, so --

6   **Q.**   Do you have any indication that Mr. Osterhout was held for

7   ransom?

8   **A.**   No.

9   **Q.**   Any information he was held for any type of a reward?

01:22   10   **A.**   No.

11   **Q.**   Did all of this transpire in less than 24 hours?

12   **A.**   Yes.

13   **Q.**   Did you ever interview Mr. Woodford?

14   **A.**   No.

01:22   15   **Q.**   Have you talked to Mr. Woodford at all?

16   **A.**   No.

17   **Q.**   Any interviews then were done by Williston Police

18   Department?

19   **A.**   Yes.

01:23   20   **Q.**   Any other interviews of Mr. Woodford, to your knowledge?

21   **A.**   No.

22   **Q.**   And do you know who in the Williston Police Department did

23   the interviews of Mr. Woodford?

24   **A.**   Yes, I do, Detective Dave Peterson.

01:23   25   **Q.**   Anybody else?

1 **A.** Not that I'm aware of.

2 **Q.** Do your records indicate whether Mr. Woodford was given

3 his Miranda warnings before being interviewed by Williston

4 Police Department?

01:23 5 **A.** Yes.

6 **Q.** And who allegedly Mirandized my client?

7 **A.** That was Detective Dave Peterson.

8 **Q.** And you've seen that in some report somewhere?  Is that

9 what your source would be?

01:23 10 **A.** No, I actually watched the video and took notes from it.

11 **Q.** So there's an actual video of that interview that either

12 you or the U.S. Attorney would have in their possession.

13 **A.** That is correct.

14 **Q.** And you're sure the Miranda warnings were given.

01:24 15 **A.** Yes.

16 **Q.** Does the video that you were watching show how many

17 Williston Police Department or other law enforcement officials

18 were in the room with Mr. Woodford?

19 **A.** The video only shows Detective Peterson sitting across

01:24 20 from a table from Nicholas Woodford.

21 **Q.** Do you have any information as to whether any other law

22 enforcement officials were in that room with Mr. Peterson and

23 Mr. Woodford?

24 **A.** Not from my vantage point, no.

01:24 25 **Q.** Anything in your reports or otherwise that you would have

1      any other information on that?

2      **A.**    No.

3      **Q.**    Did you ever drive the gravel road that the -- that Pops'

4      car allegedly traveled?

01:25      5      **A.**    No.

6      **Q.**    Do you have any reason to believe that on that gravel road

7      there would be a sign saying, "Entering the State of Montana"?

8      **A.**    No.

9              MR. ESPESETH:   Nothing further, Your Honor.

01:25      10                            EXAMINATION

11     BY THE COURT:

12     **Q.**    Agent Frank, I think it was Mr. White who described the

13     four horsemen and the roles that the four horsemen played.  Did

14     Mr. White indicate anything about what -- why Zac Mills wasn't

01:26      15     considered part of the group in terms of the four horsemen?

16     **A.**    No.

17     **Q.**    I just want to make sure I'm clear in my mind.  Is there

18     any dispute in the testimony -- or not the testimony, the

19     accounts that were given by the various participants to law

01:26      20     enforcement officers as to who all went to Montana in the

21     Butler vehicle?

22     **A.**    No, sir, not that I'm aware of.

23     **Q.**    So it was the four individuals who went?

24     **A.**    That is the general consensus per the reports.

01:26      25              MR. TUNTLAND:   Excuse me, Your Honor.  You said "the

52

1   four."  I'd like to have the names because at one point in time

2   he said Mr. Odeneal went, but that was clarified, I believe.

3   Q.   (THE COURT CONTINUING)   Why don't you indicate your

4   understanding of the four people who traveled in the Butler

5   vehicle?

6   A.   It was Jeffrey Butler driving.  It was Tyler White that

7   was sitting in the passenger's seat, and in the rear

8   passenger's seat it was Zachary Mills, it was Nicholas

9   Woodford, and in the trunk was Bobby or Robert Osterhout.

10  Q.   And did one or more of the participants in their

11  interviews with law enforcement officers indicate that

12  Mr. Butler gave instructions while they were in North Dakota to

13  the effect, and I may be paraphrasing here, to get Osterhout

14  cleaned up and get rid of him?

15  A.   That is correct.  That would be the victim, Robert

16  Osterhout, told me that in an interview.

17  Q.   Did any of the other individuals say or testify that that

18  instruction was given in North Dakota as opposed to at the

19  place where they ended up in Montana?

20  A.   I just want to refer to this report, if I could, Your

21  Honor.  In the interview that I had with Tyler White, Tyler

22  White indicates that after Zac -- after Zachary Mills was

23  punished for something that he did prior to by Jeff Butler and

24  a group of individuals, and Robert Osterhout told Zachary

25  Mills' girlfriend, Rachelle Harwood, this got back to Butler

53

01:27

01:27

01:28

01:28

01:30

1  and -- that Robert told Rachelle what happened to Zachary

2  Mills, and Butler found out about this, and Butler stated to

3  them that they needed to go and take care of Bobby.  And after

4  that they watched Bobby very closely at the camper site.

01:31

5  **Q.**  When did this conversation or statement alleged -- when

6  was this allegedly made relative to the beating in North

7  Dakota, if you know?

8  **A.**  I do not know, Your Honor.

9  **Q.**  If you know the answer to this question, the search of the

01:31

10  camper that -- or the vehicle that was -- or the trailer that

11  was Mr. Odeneal's, what was recovered from that camper or

12  trailer?

13  **A.**  I don't -- I don't know specifically what was -- like

14  everything that was found in each camper.  I was told, though,

01:32

15  that, you know, drugs were found at least in each camper.  As

16  far as weapons are concerned, I only knew that -- and from

17  Tyler White, as well as the police, that they found a shot -- a

18  sawed-off shotgun in there.  As far as Butler's -- Jeffrey

19  Butler's, according to police reports, they found a rifle in

01:32

20  there, as well as two handguns.  And then in the -- in the

21  camper that Nicholas Woodford was in, there was also a handgun

22  in there as well, but as far as Odeneal, I'm not aware, just

23  other than drugs.

24  **Q.**  And the shotgun was where?

01:33

25  **A.**  That was in Tyler White's.  And, Your Honor, if I could

54

1    just go back to your previous question that you asked about

2    wanting -- taking care of Bobby, just looking through the

3    report -- and I apologize because there's a lot of different

4    reports and statements, but according to the interview done on

01:33    5    Zachary Mills by FBI out in Portland, it was -- it was

6    indicated by Jeffrey Butler that he wanted Bobby dead.

7            THE COURT:  Mr. Volk?

8                      REDIRECT EXAMINATION

9    BY MR. VOLK:

01:33    10   Q.   Just to follow up on some of the Court's questions first,

11   Agent Frank, you were discussing what was taken from

12   Mr. Odeneal's camper.  There was also some bloody items taken

13   from that camper as well, is that correct?

14   A.   That is correct.

01:34    15   Q.   Which include what?

16   A.   On a subsequent search warrant that was conducted after

17   further information was found or discovered, they went in there

18   and they cut out a screen.  Well, they searched the camper and

19   they saw bloodstains on some curtains, on some cushions, and

01:34    20   also on some -- on a window screen, which they cut out.

21   Q.   All right.  Did Mr. Odeneal in any of his statements to

22   law enforcement indicate there were efforts made to attempt to

23   clean that up, clean blood up?

24   A.   Yes.

01:34    25   Q.   Who did he tell that to?

55

1  A.   That was Williston, Williston police.

2  Q.   Mr. Tuntland and, I believe, Mr. Espeseth were both asking

3  you questions about the location where the beating of

4  Mr. Osterhout took place, the second or subsequent one

5  following his transport in the vehicle.

6  A.   Yes.

7  Q.   Mr. Mills was interviewed by FBI personnel out in

8  Oregon --

9  A.   Yes.

10 Q.   -- is that correct?  And during the course of that

11 statement, did Mr. Mills provide some information that he

12 knew --

13 A.   Yes, he did.

14 Q.   -- they were in Montana?

15 A.   Yes, he did.

16 Q.   What did he say?

17 A.   He told special agents that he had his iPhone with him and

18 he was able to look up where exactly they were driving to, and

19 it indicated that they were in Montana.

20 Q.   And just to clarify, I believe the question was asked

21 whether or not Mr. Mills lost his phone.  Was it Mills or

22 Mr. Woodford who actually lost his phone out at this location,

23 do you recall?

24 A.   From what I -- from what I've seen, it was Nicholas

25 Woodford that lost his phone.

1  **Q.**   All right.  So Mr. Mills still had his iPhone in Oregon,

2  is that correct?

3  **A.**   Yes, that is correct.

4  **Q.**   Actually showed the agents some text messages of threats

5  that were sent to him out at that location?

6  **A.**   That is correct.  After Zac Mills left -- well, first,

7  after what was done, what Zachary Mills indicated to FBI out

8  there, as well as in interviews with Montana police, after

9  everything was done, Butler said -- Jeffrey Butler said that he

10  would kill anybody if they talked about what was done with

11  Bobby, so Mills was still at the time being punished.  He was

12  able to regain Jeffrey Butler's trust, and Jeffrey told him

13  that he could go ahead and have his -- he could have his

14  vehicle back because Jeffrey Butler took his vehicle and his

15  cellphone.  He gave it back to him, gave his cellphone back and

16  also gave him some meth to sell.

17         He also indicated that Zachary Mills needed to kill

18  his girlfriend, Rachelle Harwood.  This scared Zac, so Zac,

19  once he got his vehicle back, he got his girlfriend and they

20  fled North Dakota, and their first stop was in Montana, to law

21  enforcement out there.

22  **Q.**   Agent Frank, you've made reference during your testimony

23  just now and earlier in reference to some other incident that

24  happened with Mr. Mills at this camp site or this property.

25  **A.**   That is correct.

1   **Q.**   Did Mr. Mills describe that he was beaten at this property

2   sometime this past year?

3   **A.**   Yes.  When he was interviewed by FBI out in Oregon, he

4   told them -- or Zachary Mills told them that he was caught

5   attempting to steal a computer from Jeffrey Butler's friend.

6   They found out about it or they saw it, and in response to

7   that, Jeffrey Butler, Tyler White, James Odeneal, Nick Woodford

8   and another associate that he calls Burt took Mills, restrained

9   him with zip ties, took him into a basement of the house that's

10  on the property and tortured him in the basement.  They drugged

11  him up with meth and they beat him with brass knuckles, other

12  instruments, and used tasers.  At one point there was an

13  individual by the name of Kodiak that was there.

14          MR. TUNTLAND:  Excuse me.  I missed the name.

15          THE WITNESS:  Kodiak, an individual that goes by the

16  name of Kodiak.

17          MR. TUNTLAND:  Like the island off the coast of

18  Alaska?

19          THE WITNESS:  I don't know.

20          MR. TUNTLAND:  Okay.

21          THE WITNESS:  But Kodiak, and he -- at one point

22  during the assault, he took out a nine millimeter Ruger,

23  pointed it at Zac's head and said that he would have killed him

24  right now if it wasn't for Jeffrey Butler intervening.

25          After that, during the interview with FBI, he also

58

1   showed some of his injuries to the agents out there because he

2   said he sustained broken ribs.  He showed the agents out there,

3   and they were able to observe discoloration and bruising on his

4   ribs.  He said that, as I was saying earlier, that after the

01:40   5   assault, he was watched for a period of time, and then he

6   regained Jeffrey Butler's trust and was able to get his things

7   back.

8   Q.   (MR. VOLK CONTINUING)   You also testified that there was

9   some sort of threat made to kill Mr. Mill's girlfriend.  Can

01:40   10   you explain what Mr. Mills said about that?

11   A.   Yes.  After he -- after he regained the trust of Jeffrey

12   Butler, he was -- he was told that -- he was told to kill

13   Harwood -- Rachelle Harwood because she knew too much about

14   what happened to Bobby and also their gang, the family.

01:40   15   Q.   And how did Ms. Harwood know what had happened to

16   Mr. Mills?

17   A.   Because Robert Osterhout told her what he observed and

18   saw.

19   Q.   And according to Mr. Mills, all three of the defendants in

01:41   20   this courtroom participated in the assault of him on this

21   property?

22   A.   Yes.

23   Q.   As well as others.

24   A.   Yes, as well as others.

01:42   25   MR. VOLK:  That's all I had, Your Honor.

59

1        THE COURT:  Mr. Glass, any further questions?

2        MR. GLASS:  No, Your Honor.

3        THE COURT:  Mr. Espeseth?

4        MR. ESPESETH:  No, Your Honor.

01:42   5        THE COURT:  Or Mr. Tuntland, I guess, is next.

6        MR. TUNTLAND:  I guess I was next.  No, I don't have

7   any questions.

8        THE COURT:  Mr. Espeseth?

9        MR. ESPESETH:  No, Your Honor.

01:42   10       THE COURT:  You may be excused, Agent Frank.

11       THE WITNESS:  Thank you, Your Honor.

12       MR. VOLK:  Your Honor, I do have a statement from

13   Mr. Osterhout that he wished that we present to the Court.

14   I've provided a copy to each of the defense counsel.  I don't

01:42   15   have an exhibit sticker, if I could have one.  I've marked that

16   as Government's Exhibit Number 1.  I would offer that at this

17   time.

18       MR. TUNTLAND:  If it's okay with you, I'll just pass

19   that down.  I presume that's going to the question of bail or

01:44   20   detention?

21       MR. VOLK:  Correct.

22       MR. TUNTLAND:  Okay.

23       MR. VOLK:  Offer it at this time.

24       MR. TUNTLAND:  No objection.

01:44   25       THE COURT:  Mr. Glass?

60

1          MR. GLASS:  No objection, Your Honor.

2          THE COURT:  Mr. Espeseth?

3          MR. ESPESETH:  No objection, Your Honor.

4          THE COURT:  Government's Exhibit 1 is received.  Do

01:44   5   you have anything further?

6          MR. VOLK:  We have no other witnesses or evidence to

7   present.  We would rest.

8          THE COURT:  Mr. Glass, do you have any evidence that

9   you want to present or any proffers of evidence that you want

01:44   10  to present with respect to the issue of release or detention?

11         MR. GLASS:  No, Your Honor, not at this time.

12         THE COURT:  Mr. Tuntland, how about you?

13         MR. TUNTLAND:  There's a couple of errors in the

14  Pretrial Services Report.  The date of birth, about halfway

01:45   15  down, "The defendant, age, 22, advised that he was born on,"

16  that was written December 12th, but I was there.  It was

17  December 23rd because he doesn't get -- he doesn't get

18  birthdays.  He's a Christmas baby.

19         And then right above on the first page where it says

01:45   20  "Employment History/Financial Resources," it says Mr. White is

21  not married and has no children.  I presume it was cut and

22  paste and we didn't do the name change, search and replace, but

23  it should say "Mr. Odeneal."

24         THE COURT:  Okay.

01:45   25         MR. TUNTLAND:  Outside of that --

61

1           THE COURT:  I'll let you make an argument for release

2    or detention.

3           MR. TUNTLAND:  On the prior record, it's not clear on

4    page 2, but both charges that are listed were dismissed.  And I

01:46  5    think that is kind of clear, both Counts 1 and 2 were

6    dismissed, Your Honor, and I don't think there's any dispute on

7    that.

8           THE COURT:  Mr. Espeseth?

9           MR. ESPESETH:  Nothing, Your Honor.

01:46  10           THE COURT:  Mr. Volk, if you -- well, I'll let you

11   make an argument with regard to all the evidence.

12           MR. VOLK:  Your Honor --

13           THE COURT:  Well, I tell you what, let's talk about

14   the preliminary hearing and probable cause first, and then

01:46  15   we'll probably address the release or detention issues

16   separately for each defendant.

17           MR. VOLK:  Sure.  Your Honor, I guess from the

18   probable cause standpoint, we believe that the evidence does

19   establish probable cause for each of the defendants that are

01:47  20   charged with the offense of kidnapping as principals and/or as

21   aiders and abettors.  The elements are relatively simple.  They

22   are that the defendants either individually or by aiding and

23   abetting, unlawfully seized, confined, kept or detained a

24   person without his consent.

01:47  25           I believe that the evidence establishes that

62

01:47

1  Mr. Osterhout was, in fact, thrown into the back of an

2  automobile against his will while he was kicking and moving

3  around, and transported in that vehicle against his will

4  following a substantial assault in a camper site in Williston

5  using brass knuckles, a taser, hands, feet and fists, that each

6  of these defendants in -- well, first, Mr. Woodford was

7  principally involved in the assault.  I believe Mr. White was

8  as well.  Mr. Odeneal, I believe the testimony was, had

9  observed that assault taking place through the statement of

01:48

10 Mr. White that he actually looked in and observed it.

11         The second element is they were transported -- the

12 person was transported in interstate commerce, meaning simply

13 that he was transported across a state line.  The initial

14 assault and the placement in the vehicle took place in

01:48

15 Williston, North Dakota, and per the testimony of a statement

16 from Mr. Mills, they were physically in Montana at the time

17 that Mr. Osterhout was removed or escaped from the trunk of the

18 vehicle, where the second beating took place.

19         The final element is -- requires that he be held for

01:49

20 ransom, reward or otherwise.  The otherwise is rather broadly

21 defined to include any reason that would be of any benefit to

22 the actors.  That could be to further assault him, to kill him,

23 to prevent the discovery of his body, to prevent an immediate

24 report or, frankly, to prevent his report of any activity,

01:49

25 whether that be the assault, the kidnapping, or drug activity,

63

1 so the term "otherwise" can certainly include any of those
2 particular actions or intent.

3         I think the evidence suggests that each of the
4 defendants was a participant in that conduct.  As I indicated,
01:49    5 Mr. Woodford, by his own statement, was directly involved in
6 the beating in Williston, in placing him in the trunk, and in
7 the further assault in Montana.

8         Mr. White, by his own admission, was as well aware
9 that the beating was taking place.  The victim testified or
01:50   10 provided a statement that Mr. White, in fact, participated in
11 the assault himself.  He admitted that he was advised to obtain
12 plastic, which he did following that assault that took place,
13 that he was aware that Mr. Odeneal had lined the trunk of the
14 vehicle with the plastic, and that Mr. Osterhout was then
01:50   15 placed in the vehicle.  And Mr. White traveled with them to the
16 state of Montana, where the second beating took place.  I
17 believe there's also testimony that he was told to stay in the
18 car and watch the road as that second beating took place, so I
19 believe there's probable cause to believe that he was involved
01:51   20 or has committed this offense as well.

21         With respect to Mr. Odeneal, as I indicated before,
22 the statement of Mr. White indicates that he was aware that the
23 beating was taking place.  He admits that he removed items from
24 the trunk of the vehicle and then lined the vehicle with
01:51   25 plastic.  I think the testimony the Court heard this afternoon

64

1    that Mr. Odeneal was a participant in a prior beating of

2    Zachary Mills, who certainly -- it's something from which the

3    Court or a jury could draw an inference that Mr. Odeneal was

4    certainly well aware of what was going on in his camper with

01:52  5    respect to Mr. Osterhout.  We've also heard testimony that

6    Mr. Butler provided direction to these individuals to get rid

7    of Mr. Osterhout as well.  So, Your Honor, I believe that the

8    evidence does establish probable cause as to each of the

9    defendants.

01:52  10         With respect to the crossing of the state lines, the

11   elements actually do not require that the defendants have

12   specific knowledge that they've crossed a state line before a

13   jury could convict.  Just the simple fact that it did occur is

14   a -- is the element that is necessary.

01:52  15         So with respect to Mr. Odeneal, I think the Court and

16   a jury could certainly make an inference -- draw a reasonable

17   inference that he knew that Mr. Osterhout was going to be

18   placed in the trunk of the vehicle by his removal of the

19   contents of the trunk of the vehicle, that Mr. Osterhout's body

01:53  20   was going to be placed in there and obviously transported from

21   the Williston location.  I don't believe that it's necessary

22   for us to prove that he had specific knowledge that he was

23   going to be transported across a state line, simply that he was

24   going to be transported in that vehicle.  So, Your Honor, I

01:53  25   believe that there is probable cause as to each of the

1  defendants.

2          THE COURT:  Okay.  Mr. Glass.

3          MR. GLASS:  No argument, Your Honor.

4          THE COURT:  Mr. Tuntland.

01:53  5          MR. TUNTLAND:  First, we will concede there's

6  probable cause.  It's a very low threshold or burden, but I do

7  want to --

8          THE COURT:  I'll have you comment on release or

9  detention --

01:54  10          MR. TUNTLAND:  I just want to make two comments, very

11  short.

12          THE COURT:  Okay.

13          MR. TUNTLAND:  First off, by agreeing there's

14  probable cause, I want it understood that we disagree with most

01:54  15  of the inferences and facts recited by Mr. Volk.  There's still

16  enough there.  Number two, I want to make it clear that we are

17  not waiving any notice under Rule 404(b) of the Rules of

18  Evidence, and that's all.

19          THE COURT:  Okay.  Mr. Espeseth.

01:54  20          MR. ESPESETH:  Well, Your Honor, at least I'm not

21  conceding the issue of being in Montana yet or not.  It seems

22  like the only thing we have from the transporting from North

23  Dakota to Montana allegedly is Mr. Mills, who at some point in

24  time looked at his iPhone.  But the testimony was that

01:55  25  Mr. Osterhout had got out of a trunk and run for a while, and

66

1   even the minimal standard arguably here is not met.  When did

2   he look at his iPhone relative to the jumping out of the trunk,

3   the running away, allegedly being caught, allegedly being beat

4   the second time?  I realize it's a minimal standard, but there

01:55   5   was no independent evidence other than Mr. Mills, which just is

6   so speculative yet that it doesn't meet that minimum standard,

7   so on behalf of Mr. Woodford, I contend they didn't meet

8   probable cause.

9          THE COURT:  Okay.  Well, I conclude that there's more

01:55   10   than sufficient probable cause for the charged offense for all

11   of the three defendants, including more than sufficient

12   probable cause that the border was crossed with the victim.

13          Why don't we start then with Mr. Odeneal and the

14   issue of release or detention to Mr. Odeneal.

01:56   15          MR. TUNTLAND:  Pardon?  On the detention?

16          THE COURT:  I'm going to let Mr. Volk speak first.

17          MR. TUNTLAND:  Well, can I shorten things?

18          THE COURT:  Yep.

19          MR. TUNTLAND:  We disagreed with part of the report,

01:56   20   and unless somebody is willing to advance Mr. Odeneal money so

21   he can fly back and forth between California and North Dakota,

22   there's no reason to believe that he can make it to court if he

23   -- because that's the only place he's got to go, is in

24   California, so he's stuck here, and we agree with that.

01:56   25          THE COURT:  Okay.  Let's -- Mr. White -- Mr. Glass,

67

1   your client is requesting what?

2         MR. GLASS:  Your Honor, Mr. White does have ties to

3   North Dakota.  He does have a wife that lives in Tioga.  He

4   does have children that live in Montana, of course, but he does

01:57   5   have some family ties here to North Dakota.  I guess what we

6   would be requesting, if the Court would allow the release of

7   Mr. White, we would comply with any type of conditions that the

8   Government would have, including electronic monitoring, if so

9   required.

01:57   10        In lieu of that, maybe a halfway or like BTC while

11   the case is pending, at least there he would still be confined

12   to a place where he has to check in and out of every day, so

13   there would still be some monitoring to that extent.  At least

14   potentially he could get a job and work while this case is

01:57   15   pending.  He does have two dependents that he takes care of,

16   the two children, and he has his wife in Tioga, so I guess I

17   would ask the Court to consider an alternative to just straight

18   detention.

19        THE COURT:  Okay.  Mr. Volk?  And I know I took

01:58   20   things out of order here a little bit, but how about -- what's

21   the Government's position with regard to Mr. White?

22        MR. VOLK:  With respect to Mr. White, Your Honor, we

23   do request that the Court detain him.  I understand he has some

24   family in Tioga, but, frankly, he has only been in North Dakota

01:58   25   for a couple of years and it does not appear, as I read the

1   Bond Report, that he's on relatively good speaking terms with

2   his family in Tioga.  He indicates in the -- indicated to the

3   probation officer that he currently has no place to live.  He

4   didn't even suggest to them that that would be a location for

01:58   5   him to live.  He's been living in a camper for the past few

6   months, at a site -- at this property in Williston.  So to

7   suggest somehow that he would just simply be able to return to

8   Tioga or go to a residential re-entry center I think is not

9   appropriate.

01:59   10         He did indicate in the Bond Report as well that he is

11   a frequent user of meth and has been for the past four months.

12   Given the nature of the allegations concerning the drug

13   activity here, as well as just the simple nature of the

14   underlying offense conduct, violent nature of that conduct, he

01:59   15   -- the victim at least had provided a statement that he was an

16   active participant in that and that he did travel with this

17   group during the course of the transport, Your Honor.  We

18   believe that he does present a strong danger to the community

19   should he be released in any capacity, whether that be home on

01:59   20   electronic monitoring or at a residential re-entry center.

21         The Court can also take into account the statement of

22   Mr. Mills that Mr. White did participate in the previous

23   beating of Mr. Mills at this property as well, so I believe

24   that there is clear and convincing evidence that Mr. White is a

02:00   25   danger to the community and that he should be detained.

69

1            THE COURT:  Mr. Espeseth, I'll hear what you have to

2    say with regard to Mr. Woodford.

3            MR. ESPESETH:  Thank you, Your Honor.  Your Honor, my

4    client does have some ties to Williston.  He has an uncle who

02:00   5    lives there.  We would have reason to believe that he could

6    stay with his uncle upon being released.  We could make it a

7    condition, obviously, that we have the written consent from the

8    uncle that my client be allowed to stay with him as part of the

9    release.

02:00  10            My client was employed right up until when he was

11    arrested in August of 2012 at Sherwin Williams, and so we would

12    have reason to believe he could be employed there.  And once

13    again, we could, if the Court is so inclined, get the written

14    notice from Sherwin Williams that he would have a job to go

02:01  15    back to upon his release.  So for those reasons, we would be

16    requesting that he be released upon whatever other conditions

17    were satisfactory to the Court, but that he reside with his

18    uncle and that he remain employed.

19            THE COURT:  Mr. Volk.

02:01  20            MR. VOLK:  Again, Your Honor, we would request

21    detention of Mr. Woodford.  I believe that the evidence is

22    clear and convincing that he is a significant danger to the

23    community, participating not only in this particular event, but

24    the past event with Mr. Mills.  As I recall the testimony, it

02:01  25    seemed that Mr. Woodford in his statement indicated that he was

70

1    actually having fun participating in this assault of

2    Mr. Osterhout, so I think the gratuitous infliction of

3    violent -- violence and injury upon this victim certainly

4    suggests that Mr. Woodford is a very active danger to the

5    community.

6            While I realize he does have the uncle that -- that

7    is there, he again is a more recent resident of North Dakota,

8    only here since March of 2012, and has again been living in a

9    camper on this property, renting space at this residence in

10   Williston, which he indicates in the Bond Report was no longer

11   available to him.  I don't know if his uncle will take him

12   back.  I don't think the Court has any indication that his

13   uncle would allow him to live there at this point.

14           The defendant also indicates he's a frequent drug

15   user, marijuana, ecstasy and LSD, and I think given the nature

16   of the underlying drug distribution conduct that's been going

17   on or that the Court has heard testimony about, that also adds

18   to the level of danger to the community by Mr. Woodford, Your

19   Honor, so we would ask that the Court detain him as well.

20           MR. TUNTLAND:  If I could, Your Honor?

21           THE COURT:  Yes.

22           MR. TUNTLAND:  Mr. Odeneal, I explained to him that

23   if he would go to something like Bismarck Transition Center, if

24   he's ultimately convicted, he would not get credit for time

25   served because he would not be in the custody of the Attorney

71

1    General.  His position has changed.  He still can't leave North

2    Dakota, but he would ask that he be granted permission to go to

3    the BTC.  The evidence shows he's the least culpable of all of

4    the people, and we would ask that he be detained at BTC.

02:04    5              THE COURT:  Mr. Volk.

6              MR. VOLK:  Your Honor, we would resist that.  Again,

7    I believe that Mr. Odeneal has very, very limited contacts in

8    North Dakota.  I think his participation in this event, as well

9    as the previous event with Mr. Mills, suggests he is as well a

02:04    10   danger to the community, and that that placement at a

11   residential re-entry center, whether that's BTC or otherwise,

12   would not mitigate that danger, Your Honor, so we believe that

13   would be inappropriate.

14             THE COURT:  Well, I conclude, based on the evidence

02:04    15   that's been presented, that the Government has proved by the

16   preponderance of the evidence that each of the defendants is a

17   flight risk.  I further conclude that the Government has proved

18   by clear and convincing evidence that the defendants are risks

19   to the community.  The only question here, I think, is whether

02:05    20   or not the Court believes that it can impose terms that would

21   be reasonable to alleviate the risks.

22             And with regard to the issue of flight and whether or

23   not the defendants are a risk to the community, the defendants

24   here are facing very serious charges for which they are likely

02:05    25   facing very lengthy criminal sentences, not only for the

72

1    charged offense, but I suspect that by the time the Government

2    seeks an Indictment from the grand jury, I'd be surprised if

3    there are not additional charges relating to drugs and/or guns.

4            Each of the defendants has in their favor the fact

5    that they could find no criminal history for the defendants,

6    but -- and in most cases I would bend over backwards to release

7    a defendant in this situation to some alternative less than

8    incarceration.

9            But here the combination of factors of the underlying

10   conduct for which the evidence is very strong in favor of the

11   Government -- in fact, it's almost overwhelming at this point

12   for each of the defendants that this victim was tortured, both

13   physically and mentally in terms of being told that he was

14   going to be done away with and wrapped in plastic and shoved in

15   the trunk.  I can't think of anything hardly more vicious.  All

16   of the defendants were complicit in that, even Mr. Odeneal.  He

17   certainly -- from the evidence it's fair to conclude he knew

18   what was going on in the trailer in terms of the beatings, and

19   I don't know what he thought the purpose would be of putting

20   plastic in the trunk other than to -- other than for its

21   obvious purpose.

22           If this were one situational incident and the

23   defendants were high and I thought that there was some --

24   something in their favor in addition to their clean record,

25   maybe I would look at this differently, but here there's a

73

1   pattern of criminal activity that includes prior assaults,

2   involvement in the groups where there have been other threats,

3   significant -- very significant drug activity and guns.

4          And then what is even more troubling to the Court in

02:08   5   terms of releasing these defendants is that they're -- each of

6   them has got significant drug issues, and there's just -- the

7   Court does not feel that there's sufficient protections here to

8   release these defendants back in the community at this time.

9   For all of these reasons, the Court concludes that the

02:09   10   defendants will be held in custody pending trial.  Court is

11   adjourned.

12          (Concluded at 2:09 p.m., the same day.)

13                  - - - - - - - - - -

14

15

16

17

18

19

20

21

22

23

24

25

1                      <u>CERTIFICATE OF COURT REPORTER</u>

2              I, Sandra E. Ehrmantraut, a Certified Realtime

3   Reporter,

4              DO HEREBY CERTIFY that I recorded in shorthand the

5   foregoing proceedings had and made of record at the time and

6   place hereinbefore indicated.

7              I DO HEREBY FURTHER CERTIFY that the foregoing

8   typewritten pages contain an accurate transcript of my

9   shorthand notes then and there taken.

10             Dated this 26th day of September, 2012.

11

12                              <u>/s/ Sandra E. Ehrmantraut  </u>
                                Certified Realtime Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25